No. 88,665

STATE OF KANSAS, *Appellee*, v. MICHAEL D. WALKER, *Appellant*.

(80 P.3d 1132)

Opinion filed December 19, 2003.

*Julia S. Spainhour*, of Northeast Kansas Conflict Office, argued the cause and was on the briefs for appellant.

*Lesley A. Isherwood,* assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Michael Walker appeals his jury trial convictions of first-degree felony murder and criminal discharge of a firearm at an occupied dwelling. For his role in the drive-by shooting death of a 16-month-old child, the trial court sentenced Walker to life imprisonment and a consecutive term of 61 months' imprisonment.

On direct appeal pursuant to K.S.A. 22-3601(b)(1), Walker argues the trial court erred in failing to suppress his confession statements to police officers. Specifically, Walker argues that his statements were not freely and voluntarily made and that his *Miranda* rights were violated because police continued questioning him after he had invoked his right to an attorney and his right to remain silent. He also complains about several jury instructions.

We find that Walker made a clear and unambiguous request for the assistance of counsel during his interrogation by police and, since his request for counsel was not honored, all statements made after the request should have been suppressed. On this basis we

reverse Walker's conviction. Regarding Walker's complaints regarding jury instructions, we find that an instruction defining "reasonable doubt" was improper. We do not find error in any other instruction.

Walker's arguments regarding his statements were first asserted in a motion to suppress. At the hearing on the motion, Detective Blake Mumma testified that Walker came to the Wichita Police Investigations Bureau 3 days after the shooting because he had heard that police wanted to speak with him. Walker's father brought him to the Bureau.

The interview began at 9:15 a.m. with some general biographical questions. Mumma advised Walker of his *Miranda* rights, and Walker indicated that he understood and wished to waive those rights and speak to the police. Walker initialed and signed a *Miranda* waiver form. Mumma stated that Walker had been questioned in previous criminal investigations and was well acquainted with the process, although Mumma had never personally read him a *Miranda* warning before.

Mumma and Detective Gouge were initially with Walker for about 50 minutes, during which Walker denied any involvement with the shooting or any knowledge about what happened other than rumors. After the initial interview, Walker was left alone in the locked interview room for over an hour. Questioning was reinitiated after which Walker was again left alone in the interview room. Detectives again returned and, after some additional questioning, placed Walker under arrest and handcuffed Walker to the table in the interview room. The arrest occurred at 1:38 p.m., slightly more than 4 hours after the interview began. The detectives again left Walker alone. He started yelling and banging on the table, wanting someone to stay with him. Various officers came and went. Whenever he was left alone in the room, Walker would yell and bang on the table. At around 4:14 p.m., an officer shackled Walker's foot to the table. Except for escorted restroom breaks, Walker was in the same interview room until 10:10 p.m., almost 13 hours after the interview began. He was not allowed to talk to his father or other family members.

Over the 13 hours, 10 Wichita police officers had contact with Walker, at least 5 of whom asked questions related to the investigation: Mumma, Gouge, Espinoza, Robinson, and Landwehr. Various techniques were employed to encourage Walker to talk.

Walker continued to deny involvement in the shooting until almost 10 hours into the interview. Detective Mumma described Walker's statements for the jury. According to Mumma, Walker's initial story about what happened the night of the shooting gradually grew and changed. Walker initially told police he had gone to a nightclub and then to a motel with a female. He then added that he had also gone to a Kwik Shop before going to the motel. Walker eventually stated that he had been in a nightclub and witnessed a fight among friends. He drove to a Kwik Shop and then to a place near Fairmount Park. While driving in a caravan of three cars, another car followed them and shots were fired at Walker's car. Walker went to a Total convenience store and spoke on the phone with Jermane Lowe. He then drove to another location where two passengers exited his vehicle and two new passengers got in, Lowe and a person Walker referred to as "Burn."

After 10 hours of questioning, Walker admitted he drove the shooters to the scene. According to Detective Mumma, Walker said he was directed where to drive. He drove to near 10th and Cleveland, circled a block, and pulled into a driveway about a block away from the victim's house. The two passengers got out of his vehicle, walked down in front of the victim's house, and fired at it. Walker said that he was on the phone with Jendayi Maples when the shots were fired and that he had dropped the phone. When he picked it up, he said, "Damn, that was loud." The two passengers then returned to the vehicle, and they sped away.

Walker said that they had gone to 10th and Cleveland "looking for Crips." The Bloods and Crips had been involved in an earlier shootout, and Walker also believed Crips were responsible for shooting at him near Fairmount Park. Walker initially stated there were only two other people in the car, but when confronted with information that three different kinds of bullets had been recovered from the crime scene, he stated there was a fourth person in the car. Walker never admitted to being one of the shooters; he

said he was only the driver and prior to the shooting was instructed that all he had to do was park and wait.

Walker identifies at least 14 statements during the interrogation which he argues were clear requests for an attorney; about 17 requests to contact family members, some of which were to tell his family he was under arrest and others to ask family members to get him an attorney; and numerous statements where he indicated a desire to stop the police questioning by demanding to be taken to the county jail across the street and stating he had no more to say. He also argues that his statements were coerced and involuntary.

The trial court considered the videotapes and transcript of the interview and the testimony offered at the suppression hearing. The court denied the motion to suppress. The court rejected Walker's argument that he had invoked his right to remain silent, finding that Walker never clearly invoked his right to remain silent. Rather, Walker wanted and needed to talk to someone. Regarding Walker's mention of an attorney, the court found that Walker only wanted an attorney to make a deal with the district attorney. When detectives told Walker that if he wanted an attorney the police could not talk to him, Walker made clear that he wanted to keep talking to police.

The trial court found that Walker had numerous previous contacts with police and understood the questioning process. Although he was held for 13 hours and could not communicate with the outside world, the trial court concluded that the police treated him fairly, giving him bathroom breaks and providing him with food, beverages, and cigarettes. Finally, the trial court concluded that police never made Walker any promises and made clear that only the district attorney could decide what charges to file against him and whether to make a deal with him.

### Did the Trial Court Err in Failing to Suppress Walker's Statements to Police?

Walker argues that each of these conclusions by the trial court was erroneous and that his statements should have been suppressed. As a preliminary matter, the State, in its brief, contends

that Walker failed to preserve this issue for appeal by not objecting when his statements were introduced at trial through the testimony of Detective Mumma. However, the State withdrew this issue at oral argument. Moreover, the record reflects that Walker did make a contemporaneous objection to Detective Mumma's testimony. Thus, the issue was preserved for review. See *State v. Jones*, 267 Kan. 627, 637, 984 P.2d 132 (1999).

In reviewing a trial court decision regarding the suppression of an accused's statements, "we review the factual underpinnings of the decision by a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment." *State v. Webber*, 260 Kan. 263, 274-75, 918 P.2d 609 (1996); see *State v. Henry*, 273 Kan. 608, Syl. ¶ 2, 44 P.3d 466 (2002); *State v. Baston*, 261 Kan. 100, 104-05, 928 P.2d 79 (1996); *State v. Vandiver*, 257 Kan. 53, 57-58, 891 P.2d 350 (1995).

The rules regarding custodial interrogations and an accused's constitutional rights are well established. The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). The United States Supreme Court and this court have recognized that these rights are " 'sufficiently important to suspects in criminal investigations' " to require that any waiver of the right be knowing and intelligent. *State v. Henry*, 273 Kan. at 613 (quoting *Davis v. United States*, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 [1994]); see *Edwards v. Arizona*, 451 U.S. 477, 488, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981) (Powell, J., concurring). If a suspect knowingly and intelligently waives these rights, law enforcement officers are free to ask questions. *North Carolina v. Butler*, 441 U.S. 369, 372-73, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979).

Invocation of the *Miranda* right to counsel may occur at any time and "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 115 L. Ed. 2d

158, 111 S. Ct. 2204 (1991). This rule has two aspects. First, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. Second, the request must be for assistance with the custodial interrogation, not for subsequent hearings or proceedings. *McNeil*, 501 U.S. at 178.

Regarding the first aspect of the rule, an objective standard is applied in determining if the statements by the accused " 'can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Davis*, 512 U.S. at 459 (quoting *McNeil*, 501 U.S. at 178). If the desire for counsel is presented "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," no ambiguity or equivocation exists, and all questions must cease. *Davis*, 512 U.S. at 459. The Supreme Court recognized that the application of an objective standard "might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel . . . ." 512 U.S. at 460. On the other hand, however, the Court noted "a suspect need not 'speak with the discrimination of an Oxford don.' " *Davis*, 512 U.S. at 459. When the accused makes an ambiguous statement about asserting his or her right to remain silent or to speak with counsel, it is good practice for the interrogator to ask clarifying questions; however, it is not required and the questioning may continue. *Davis*, 512 U.S. at 459-60; *State v. Caenen*, 270 Kan. 776, 787-88, 19 P.3d 142 (2001); *State v. Speed*, 265 Kan. 26, 37-38, 961 P.2d 13 (1998).

The second aspect of the rule, that the request must be for an attorney's assistance in dealing with the custodial interrogation by police, was an important factor in the trial court's analysis of Walker's requests. Consistent with the trial court's ruling, some courts have held that selectively answering questions regarding certain subjects but indicating a desire to have an attorney work out a deal before answering other questions is not a clear invocation of the right to an attorney. See *United States v. Banks*, 282 F.3d 699 (9th Cir. 2002) (defendant's assertion that he wanted to consult a lawyer

about making a deal in exchange for information about his suppliers not an invocation of his right to counsel); *United States v. Jardina*, 747 F.2d 945 (5th Cir. 1984) (defendant selectively waived right to remain silent and indicated he wished his attorney to work out cooperative deal with government in future); *State v. Shifflett*, 199 Conn. 718, 508 A.2d 748 (1986) (defendant's statement that attorney would be needed to work out future plea bargain not an assertion of right to counsel); *State v. Hale*, 453 N.W.2d 704 (Minn. 1990) (defendant's fleeting off-hand comment regarding future need for good attorney to defend himself not an invocation of right to counsel).

However, simply putting the request in the context of a future plea bargain does not mean that the assertion cannot be a present request for an attorney. This is illustrated by *Edwards v. Arizona* where Edwards sought to make a deal with police. Police told him they wanted a statement but had no authority to negotiate a deal. Police gave Edwards the telephone number of a county attorney, and Edwards placed a call but hung up after a few moments. He then said, "I want an attorney before making a deal." 451 U.S. at 479. Questioning then ceased. The Supreme Court stated: "The Arizona Supreme Court was of the opinion that this was a sufficient invocation of his *Miranda* rights, and we are in accord." *Edwards*, 451 U.S. at 487.

Once the right to counsel has been invoked, the courts impose a "relatively rigid requirement that interrogation must cease . . . ." *Fare v. Michael C.*, 442 U.S. 707, 718, 61 L. Ed. 2d 197, 99 S. Ct. 2560, *reh. denied* 444 U.S. 887 (1979). Questioning can be resumed only after a lawyer has been made available or the suspect reinitiates conversation. *Edwards*, 451 U.S. at 482, 484-85; *Henry*, 273 Kan. at 613. The *Edwards* rule provides a "second layer of prophylaxis for the *Miranda* right to counsel." (*McNeil*, 501 U.S. at 176) which is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." (*Michigan v. Harvey*, 494 U.S. 344, 350, 108 L. Ed. 2d 293, 110 S. Ct. 1176 [1990].) See *Henry*, 273 Kan. at 613.

In determining whether an accused has waived a previously asserted constitutional right, the court must first determine whether

the accused actually invoked the right and, if so, whether the accused (1) initiated further discussions with police and (2) knowingly and intelligently waived the previously asserted right. *Smith v. Illinois*, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984). The prosecution has the burden to show that subsequent events indicated a waiver of a previously asserted right and that the waiver was knowing, voluntary, and intelligent under the totality of the circumstances. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983); *State v. Matson*, 260 Kan. 366, 374, 921 P.2d 790 (1996). A valid waiver of a previously asserted right "cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484. Further, the accused's statements must evince "a willingness and a desire for a generalized discussion about the investigation" and "not merely [be] a necessary inquiry arising out of the incidents of the custodial relationship." *Bradshaw*, 462 U.S. at 1045-46.

With these principles in mind we turn to the specifics of the statements in this case. The State argues that many of Walker's statements regarding an attorney were not clear requests for counsel. We agree that many were ambiguous. For example, at one point Walker asked, "[D]o I need to get a lawyer?" On prior occasions, this court has concluded that this question, or one essentially the same, is ambiguous and equivocal and, therefore, not a clear invocation of the *Miranda-Edwards* right to counsel. *State v. Ninci*, 262 Kan. 21, 43-44, 936 P.2d 1364 (1997); *State v. Bailey*, 256 Kan. 872, 885, 889 P.2d 738 (1995).

Additionally, as noted by the trial court, many statements referenced a desire to hire an attorney to work out a deal but did not express a present request for an attorney. Such statements included, "That's why I can't wait to get over there [to jail] man so I can call a lawyer and tell him" and "my peoples . . . need to go get me a lawyer so the lawyer there to talk to me."

However, at other times the request for an attorney was clear. For example, at one point when Walker made an ambiguous statement regarding an attorney, the detective sought clarification, "[W]hen you were talkin' about a lawyer, I mean, are you wanting

one right, like right this minute?" Walker did not orally respond, but did nod his head. The State does not dispute this fact. It is also clear that the officer saw the response because he replied, "Yeah. Well I can't talk to you anymore." However, Walker immediately indicated he wanted to continue to talk. Under similar circumstances, this court has determined such action by an accused is an effective withdrawal of the invocation of the right to counsel and a reinitiation of the conversation by the accused. *Henry*, 273 Kan. at 617.

Shortly after Walker reinitiated the conversation, the following exchange occurred:

| | |
|---|---|
| Walker: | "Can you get me one right now?" |
| Detective: | "No, not right now." |
| Walker: | "That's what I'm sayin'." |
| Detective: | "But then, I mean if you want one right now, then I couldn't talk to you any more—that's why I'm—that's what I'm telling you. I just wanna make sure that you're alright with just us in here shootin' the bull. And if you're not and I have to leave the room, I don't want you bangin' on the table. Otherwise I have to sit in here and just look at you." |

Walker then asked if they were ready to take him across the street. The officer replied, "pretty quick," and began to take Walker's personal possessions from him. The officer did not ask any questions about the investigation. However, Walker asked several, including whether another suspect had arrived yet and whether police had an eyewitness who saw Walker. Such questions about the investigation could be seen as evincing a willingness and a desire for generalized discussion about the investigation. *Bradshaw*, 462 U.S. at 1046.

Then Walker asked to talk to a Wichita police officer, Alex Robinson. Walker directed, "Tell him I need to talk to him about something that I can't talk to y'all about." The officer left and then returned to report that Robinson was on his way. Walker clearly initiated discussion, saying he wanted the officer to stay and talk while they waited for Robinson to arrive. Walker continued to ask questions about the investigation and then asked, "So what is a

man supposed to do when they take his life from him?" This led the detective to urge Walker to take responsibility if he was involved or if he was not involved but knew something by stating, "then you have the responsibility to tell the truth . . . ." After further discussion, Walker again denied being the "trigger man" and stated:

Walker: "Call my grandma, tell her go get me a lawyer or somethin'."

Gouge: "You know every time you mention a lawyer, I have to clarify with you, whether or not you want to continue to talk to us? Or are you looking to get a lawyer later?"

Walker: "I'm talk—I'm talkin' to you man."

Thus, to this point Walker continued to reinitiate contact after making a request for an attorney.

Walker was again left alone and, while apparently alone, twice stated, "Get me that lawyer man." There was evidence that Walker was not constantly monitored, and there was no showing that these statements were heard by Wichita police.

Soon thereafter, Officer Robinson came into the room. Robinson had known Walker since Walker was 11 or 12 years old and also knew Walker's grandmother and other family members. Walker asked Robinson, "You ain't in here for the police case is you?" Robinson answered, "No."

Shortly after Robinson arrived, Walker made clear that he had asked to speak to Robinson in order to ask Robinson to help Walker's family hire an attorney. Robinson asked why Walker thought he needed an attorney, and Walker responded, "[Because] they gonna try to pin this shit on me man." Robinson then asked, "Do you know anybody that'd know anything about—was—do you know them people?" After about 10 minutes of additional questions, Walker said, "Alex, look, *this is all I want to ask you man.* Will you, will you rec—will you recommend a lawyer to my grandma . . . ." (Emphasis added.)

After Walker made it clear that he wanted Robinson to help Walker's family find an attorney, Robinson continued urging Wal-

ker to tell the police what happened. After some discussion, including additional urging to talk, Walker said:

Walker: "I ought to get me a paid lawyer. Then I'm have to strike a deal with the DA. *Then I'm gonna tell.* Okay? So will you help my grandma to get me a good lawyer? So that's what I'm gonna do—is try to talk to those people out there. 'Cause—get me a paid lawyer, soon as I get a pay lawyer, strike a deal with the DA, but I gotta have complete immunity." (Emphasis added.)

. . . .

Robinson: "Okay. You stay strong boy."

Walker: (Whispering) "I will, you gonna help me get a lawyer?"

Robinson: "I'll talk to your grandma."

We find no basis to distinguish this request from the request in *Edwards v. Arizona* where the Supreme Court agreed that Edwards' statement "I want an attorney before making a deal" was a sufficient invocation of his *Miranda* rights. *Edwards*, 451 U.S. at 479, 487; see also *Brewer v. Williams*, 430 U.S. 387, 405, 51 L. Ed. 2d 424, 97 S. Ct. 1232 (1977) ("statements . . . that he would tell the whole story after seeing [his attorney] were clearest expression by [the defendant] himself that he desired the presence of an attorney before any interrogation took place").

However, Walker then said:

Walker: "But I know.. Alex .. don't leave until they take me next door."

Robinson: "Okay."

Walker: (Whispering) "I mean, stay in here with me man. I'm not gonna really tell you who did it—"

There is some question about whether this request for company was a voluntary waiver of his asserted right to counsel, but again we need not resolve that issue because of a subsequent unambiguous statement by Walker that he wanted an attorney before he told police anything.

The next statement followed a discussion of several matters, including Walker's reputation, who would take care of Walker's chil-

dren while he was in jail, and the chance that Walker's grand-mother would die while Walker was in custody. Walker still refused to talk:

Walker: "I can't tell. No. I can't tell. I can't talk about no telling until I see what I can get out of it. If I can't get nothin' out of it, man, I ain't tellin' you."

As they talked, Robinson continued to urge Walker to tell de-tectives what Walker knew about the shooting, to get it off "his chest," and to not go to jail for something Walker did not do. At one point, the following exchange occurred:

Walker: (Whispering) "I wanna tell you everything I—but you gonna go tell them."

Robinson: "I got to tell."

Walker: (Whispering) "No, you don't."

Robinson: "Cause this is—this is a—murder investigation."

Walker: (Whispering) "So you're gonna have to tell my peo-ple."

Robinson: "Yeah, I'll talk to your grandma about a lawyer."

At this point, because of whispering, some of what Walker says cannot be heard on the videotape. Then Walker continued:

Walker: (Whispering) "Have they got the death penalty in Wichita?"

Robinson: "In Kansas?"

Walker: (Whispering) "Yeah."

Robinson: "Yeah, they got it."

Walker: (Whispering) "So they got the—"

Robinson: "All states got it now, just about."

Walker: (Whispering) "Think the shooter will get that? "

Robinson: "Yeah man. You—you need to get this stuff off of your chest. An then—"

Walker: (Whispering) "If I could talk to my grandma right now. I just need to talk to a lawyer, man. If I could talk to a lawyer, the lawyer know what's up. Can you get me a lawyer? The Detectives gonna book me into the county. If I call right now, then my lawyer come up here and talk to them. I can't wait till I go downstairs."

| Robinson: | "It'll probably be tomorrow, it's almost 6 o'clock." |
| Walker: | (Whispering) "So?" |

Especially in light of his previous statements to Robinson regarding having an attorney and then talking to police, these statements were a clear, unequivocal invocation of Walker's *Miranda-Edwards* right to an attorney. His expressions were immediate, "right now" and, "I can't wait." And there was a clear request for an attorney, "I just need to talk to a lawyer." See *State v. Monroe*, 103 Idaho 129, 645 P.2d 363 (1982) (statements by accused that he thought he should see lawyer before making a statement, that he would make a statement after being advised by an attorney, and that he wanted an attorney before talking to police were sufficient to invoke right to counsel).

However, in contrast to the previous invocations of the right to counsel, Walker did not initiate subsequent conversation. Rather, Robinson initiated discussion about the expense of hiring an attorney. After some discussion regarding court-appointed attorneys, Robinson said, "But you're probably gonna have to go to jail—if you talk to them though." Clearly, the discussion and subsequent communication was not initiated by Walker but by Robinson.

The State argues that Robinson was not acting in the capacity of a police officer but a friend. Although Robinson had sent Walker mixed messages regarding his capacity, Robinson, who was in uniform, told Walker he would have to advise the detectives of what Walker said about his role in the shooting. Robinson clearly understood his role as a police officer imposed certain duties upon him.

Further, the State argues that Robinson was not interrogating Walker. The numerous questions Robinson asked Walker belie this argument. Furthermore, in *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d. 297, 100 S. Ct. 1682 (1980), the Supreme Court noted that police use indirect methods to obtain information from suspects without directly questioning them. The Court concluded that the protection afforded by *Miranda* would have little meaning if these latter types of practices could be used without the strictures of *Miranda* and held that interrogation constituted "any words or action on the part of the police (other than those normally atten-

dant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301. Robinson's techniques were interrogation.

Also, Robinson left the interview room and Detective Mumma returned and initiated discussions with Walker. Mumma again urged Walker to talk, and then Walker said, "I'm going to send you back out there again." Mumma left the room. Robinson returned and began telling Walker more about evidence the police had. Over an hour after Walker said, "I just need to talk to a lawyer," Walker again said to Robinson, "[G]et me a good lawyer man." Robinson continued to talk to Walker saying things like, "I didn't know they had all that stuff on there though—like this bad man—it's bad." Robinson then told Walker, "You need to get this stuff off your chest man." Walker replied in a whisper, "I can't." Robinson continued to persuade Walker to talk. Eventually, several hours after clearly invoking his right to counsel, almost 13 hours after the interview began, more than 8 hours after being arrested and handcuffed to the table, and after repeated requests he be taken to the jail, Walker finally told police about his involvement in the shooting.

This situation falls clearly within the *Edwards* prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights. See *Edwards*, 451 U.S. at 484-85; *Bradshaw*, 462 U.S. at 1044.

Once Walker said, "If I could talk to my grandma right now. I just need to talk to a lawyer, man—I can't wait till I go downstairs," police were required to honor that request. Their failure to do so requires suppression of all statements after that point and, because the confession was not suppressed, reversal of Walker's convictions.

Consequently, we need not reach the issues of whether the trial court erred in concluding that Walker did not clearly invoke his right to remain silent or that the statement was voluntary.

### Did the Trial Court Err in Instructing the Jury?

Walker raises several complaints about jury instructions. Many of the arguments relate to instructions given in response to ques-

tions asked by the jury during its deliberations. These issues were unique to this jury's deliberations, are not likely to arise again, and, therefore, will not be discussed since the convictions are being reversed. However, we will consider the issue related to the court's initial instructions to the jury to provide guidance if there is another trial of this matter. We will also discuss the reasonable doubt instruction given in response to a jury question since such an issue may arise again.

The issue regarding the court's instructions to the jury relates to Instruction No. 4A, which stated:

"Evidence has been admitted tending to prove that Mr. Walker committed crimes other than the present crimes charged. This evidence may be considered solely for the purpose of explaining why Mr. Walker was in possession of Mr. Shaffer's car. This evidence may not be considered for any other purpose."

Walker complains that this instruction is not found in PIK Crim. 3d, it unnecessarily highlights the testimony of Scott Shaffer, and it presumes that Walker was in possession of Shaffer's car at the time of the crime, which invades the jury's province as factfinder.

The State correctly contends that this instruction was clearly patterned after PIK Crim. 3d 52.06 which limits the purpose for which other crimes evidence may be considered by the jury. At trial, Scott Shaffer testified that he occasionally loaned his car to Walker in exchange for drugs. The limiting instruction admonished the jury not to consider the evidence of Walker's involvement with drugs except to explain why he had Shaffer's car. While we have often stated that PIK instructions should be used where they are appropriate, we have also stated that "[i]f the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition." *State v. Pioletti*, 246 Kan. 49, 58-59, 785 P.2d 963 (1990). Here, the evidence and issues did not fall within the language of the standard instruction and it was appropriate to modify the language in an effort to guide the jury in its appropriate consideration of the evidence and away from considerations which could have prejudiced its deliberations. The instruction accurately stated the law and was not clearly erroneous.

The reasonable doubt instruction arose in response to a question by the jury. The trial court initially gave the jury an instruction regarding the burden of proof, presumption of innocence, and reasonable doubt that was consistent with PIK Crim. 3d 52.02. The jury sent a note requesting a clear definition of reasonable doubt. The State argued that according to PIK no definition of reasonable doubt should be given. The trial court informed defense counsel that it would give such an instruction if counsel so desired. Defense counsel asked to see the court's proposed definitions. After being provided two possible definitions, defense counsel stated he knew of no reason to object to either instruction and then chose one. The trial court gave the jury the following, lengthy definition of reasonable doubt:

"You are instructed that a reasonable doubt is just what the words themselves imply — a doubt founded on reason. *It is such a doubt as a juror is able to give a reason for.*

"A 'reasonable doubt' is not a mere possibility, an imaginary doubt, a doubt arising from a whim, mere fancy or a sudden change of mind without any apparent or adequate reason therefore. It cannot be based on groundless conjecture.

"Reasonable doubt is that state of the case which, after a comparison and consideration of all the evidence presented to you, leaves your mind in that condition that you cannot say you have an abiding conviction to a *moral certainty* of the guilt of Mr. Walker. A juror has a reasonable doubt when he does not have an abiding conviction of mind, founded on the evidence or want of evidence, to a *moral certainty* that convinces and directs his understanding and satisfies his reason and judgment that Mr. Walker is guilty as charged.

"Stated another way, if you have a reasonable doubt as to the existence of any of the claims in instruction no. 10 or no. 11, you must find Mr. Walker not guilty. If you have no reasonable doubt as to the existence of any of the claims in instruction no. 10 or no. 11, you must find Mr. Walker guilty." (Emphasis added.)

Walker takes issue with several components of the instruction, including the phrase: "It is such a doubt as a juror is able to give a reason for." A similar phrase was considered by this court in *State v. Banks*, 260 Kan. 918, 927 P.2d 456 (1996), when deciding whether a mistrial should have been granted after the prosecutor made the following statement during closing argument: "Reasonable doubt means if you are going to say these men are not guilty of something, you have to give a reason for it." 260 Kan. at 926. In finding the statement "improper" we specifically disapproved

contrary language in two other cases where the court had previously approved a definition of reasonable doubt as "such a doubt as a juror is able to give a reason for." 260 Kan. at 928.

The remaining several paragraphs of the instruction are well described by the words of our Court of Appeals in *State v. Acree*, 22 Kan. App. 2d 350, 916 P.2d 61 (1996): "Efforts to define reasonable doubt, other than as provided in PIK Crim. 3d 52.02, usually lead to a hopeless thicket of redundant phrases and legalese, which tends to obfuscate rather than assist the jury in the discharge of its duty." We also agree with the directive of that court when it strongly counseled the trial bench "to use PIK Crim. 3d 52.02 and resist requests for a more expansive definition." 22 Kan. App. 2d at 356.

This advice applies even where the request for a more expansive definition comes from the jury. Although the trial court has a mandatory duty to respond to a jury's request for further information as to the law of the case, the manner and extent of the trial court's response rests in the sound discretion of the trial court. *State v. Myers*, 258 Kan. 51, 55, 899 P.2d 1036 (1995). It would not have been an abuse of discretion, but rather an appropriate exercise of discretion, to have replied to the jury using the advice of this court as long ago as 1882: " '[N]o definition or explanation can make any clearer what is meant by the phrase "reasonable doubt" than that which is imparted by the words themselves.' " *State v. Bridges*, 29 Kan. 138, 141 (1882).

Reversed and remanded.