IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,008

STATE OF KANSAS,
*Appellee,*

v.

VERLEE MCCULLOUGH III,
*Appellant.*

SYLLABUS BY THE COURT

1.

When considering a defendant's motion to suppress, an appellate court reviews the district court's factual findings for substantial competent evidence; the district court's legal conclusions are reviewed de novo.

2.

The Fifth Amendment to the United States Constitution requires any statements stemming from a custodial interview to be excluded unless the State proves that procedural safeguards, i.e., *Miranda* warnings, were used to secure the waiver of defendant's constitutional rights.

3.

In determining whether an interview is custodial, the overall consideration is whether, under the totality of the circumstances, a reasonable person would have felt free to terminate the interview and disengage from the encounter; this court has enumerated eight nonexclusive factors that are useful in making this holistic evaluation, including but not limited to (1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person

1

questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, e.g., whether the person was allowed to leave, was detained further, or was arrested after the interrogation.

4.

An accused's right to remain silent during a custodial police interview arises under both the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. When a suspect invokes the right to silence, this invocation must be scrupulously honored and the interview must end. However, an invocation is only effective if, in context, it is unambiguous and without equivocation.

5.

Defendant's post-*Miranda* statement, that he did not want to answer questions about a particular subject "'cause [he did not] know where this is going" was ambiguous and equivocal and did not clearly invoke a right to silence, thus there was no error in the denial of defendant's motion to suppress statements made after the alleged invocation.

Appeal from Wyandotte District Court; AARON T. ROBERTS, judge. Oral argument held October 27, 2025. Opinion filed January 30, 2026. Affirmed.

*James M. Latta*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*David W. Greenwald,* assistant district attorney, argued the cause, and *Nicholas Campbell*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WALSH, J.: After a mistrial, a second jury convicted Verlee McCullough III of one count of premeditated first-degree murder for the shooting death of his on-again-off-again romantic partner, Ashley Jones. On the day of the shooting, law enforcement interviewed McCullough at the local detective bureau. On direct appeal, McCullough asserts this interview included two constitutional errors based on his Fifth Amendment rights, and further asserts these errors cumulatively deprived him of a fair trial. We conclude that, under the totality of the circumstances, McCullough was subjected to a custodial interview before he was read his *Miranda* rights and the admission of that portion of the interview was erroneous. We do not, however, agree with McCullough that he unambiguously and unequivocally invoked his right to silence following *Miranda* warnings. Because the content of the erroneously admitted pre-*Miranda* statements was also included in evidence that was properly considered by the jury, the error was harmless. And because we conclude there was only one error, we do not reach McCullough's cumulative error argument. We therefore affirm the judgment of the district court.

FACTUAL AND PROCEDURAL BACKGROUND

On July 22, 2021, the State charged Verlee McCullough with the first-degree premeditated murder of Ashley Jones. Jones and McCullough shared a young daughter, V.M., and had been in an on-again-off-again relationship for nine years. They generally lived together at a Kansas City residence, which McCullough described as his "primary house." At the time, Jones' teenage son, T.T., was also staying at the home.

Jones was found dead in the residence in the early hours of July 8, 2021, with a single gunshot wound to her head. The day before, McCullough had dropped off their daughter and then left. As the day turned to night, McCullough and Jones argued over the

3

phone and through text messages. Jones threatened to take their daughter and move to Texas. McCullough accused her of being a bad mother.

Jones' son locked the front door before everyone went to bed that evening. Jones fell asleep on the couch on the main floor of the residence, and T.T. and V.M. went upstairs, where T.T. played video games.

Meanwhile, across town, McCullough spent part of the evening at a bar with his sister and her husband. He left the bar around 10:30 p.m. and went to a hotel room rented by his other girlfriend, Dione Rucker. The hotel had cameras in the parking lot and hallway. The cameras captured McCullough enter Rucker's room at around 11:15 p.m., leave at around 12:30 a.m. wearing white tennis shoes, exit the parking lot driving Rucker's Grand Am, return to the parking lot in the Grand Am at approximately 2 a.m., and then enter Rucker's room wearing black shoes. Additionally, cameras across the city tracked the Grand Am's movements. After leaving the hotel, the Grand Am ended up parking near Jones' residence. A camera also captured an unidentifiable person coming from the direction of the parked car and walking toward Jones' residence through an alleyway and a side yard a little before 1 a.m. The figure went in and out of the area—between the front and the back of the house—a few times, and then at around 1:16 a.m., the video depicts the subject appearing to have left Jones' front yard and moving quickly down the side of the house into an alley, headed in the last known direction of Rucker's vehicle. A few minutes later, the Grand Am is captured on cameras moving toward Rucker's hotel, and hotel cameras show McCullough reenter the hotel.

Rucker testified that McCullough was allowed to use her car, her keys were available in the hotel room that night, and that on the morning of July 8 she found her car in a different parking spot than she had left it.

4

Back at the residence, T.T. was upstairs playing games when, somewhere between 1 a.m. and 2 a.m., T.T. "heard a loud crashing, . . . like something had fallen over" coming from downstairs. He went down to investigate and saw Jones lying on the couch. He called her name, and she did not respond, but he assumed she was sleeping. He then checked all the rooms. He said her name a second time to no response and then went back upstairs. Around 20 or 30 minutes later he went back downstairs to get some milk. As he was making his way up the stairs he heard another loud bang. He checked on Jones again, called her name, and shook her, but she was unresponsive. Again, he assumed she was in a deep sleep and went upstairs after checking all the rooms. He played video games until approximately 4 a.m. when he went to sleep.

The next morning, McCullough texted Jones asking if he needed to come pick up V.M. to take her to daycare. Jones did not respond, and McCullough eventually drove over to the house in his Ford Explorer. He found the door unlocked, went upstairs to get V.M., and told her to go downstairs to have Jones fix her hair. V.M. came back saying Jones would not wake up. McCullough went into the room, saw blood on Jones' back, then called 911 and had V.M. and T.T. wait outside.

When officers arrived, McCullough was acting agitated. He told officers that his Ring camera was missing from the front door. During their investigation, officers found two live 9-millimeter shells under the couch where Jones was shot. There was no evidence of a break in or burglary. Investigators never found a weapon or any DNA or fingerprint evidence.

Officers eventually placed McCullough in the back of a police SUV, took his phone and wallet, and drove him to the detective bureau. He was taken to an interview room where he waited for approximately 50 minutes until Detective Jason Sutton arrived and began asking questions. During this initial questioning period, McCullough asserted

5

several times that he had not left Rucker's hotel room the night before and that, until that morning, his last visit to Jones' residence was when he dropped V.M. off the day before.

Detective Sutton read McCullough his *Miranda* rights approximately 1 hour and 45 minutes after McCullough arrived in the room. Shortly after, he asked if McCullough wanted to talk about "the whole Dion[e] thing and about the comings and goings and stuff." McCullough replied, "No, 'cause I don't know where this is going." Following this, the interview continued with occasional breaks for over five hours. During this stage of the interview, McCullough again asserted he never left the hotel that night and also told officers he did not have any guns. He was allowed to leave when the interview was over; police returned his phone and wallet and gave him a ride.

The State charged him a few weeks later with Jones' murder. Prior to his first trial, McCullough stipulated to the entry of his entire interview into evidence. His first trial ended with a hung jury.

Prior to the second trial, McCullough moved to suppress the interview. In the motion, he argued (1) his pre-*Miranda* statements should be suppressed because he was in custodial interrogation; and (2) his post-*Miranda* statements should be suppressed because McCullough invoked his right to silence. The district court held a hearing on the motion and denied it. Regarding the pre-*Miranda* statements, the district court found McCullough was not in a custodial interview because law enforcement was following their standard procedures. The district court found the post-*Miranda* invocation equivocal because the phrase "'cause I don't know where this is going" qualified McCullough's "no."

At the second trial, the State presented testimony from four individuals who indicated they had previously seen McCullough with guns. Eddie Jones Jr. and King Clinton both testified that McCullough had shown them long rifles and handguns—

6

specifically 9-millimeter handguns, including one with a suppressor, according to Clinton—at a Fourth of July party just days before Jones was murdered. A KBI forensic scientist in the firearm and toolmark section testified that the bullet used to kill Jones was part of the .38 caliber family, which includes 9-millimeter.

The State entered into evidence a video montage of surveillance footage and, over McCullough's objection, the video of McCullough's interview. Detective Sutton and Detective Mark Bundy testified that McCullough told them multiple times that he never left the hotel that evening. Detective Bundy also testified that McCullough told him that he did not own any guns.

The jury found McCullough guilty of first-degree murder, and the court sentenced him to life in prison.

This is McCullough's direct appeal.

ANALYSIS

I. *It Was Constitutional Error to Subject McCullough to a Custodial Interview Prior to Reading Him His* Miranda *Rights*

McCullough first argues that officers improperly interrogated him without first giving him his *Miranda* rights and that the district court erred in denying his motion to suppress his pre-*Miranda* statements. McCullough raised this issue prior to his second trial and, following an evidentiary hearing, the district court held McCullough was not in a custodial interrogation. Although he had not objected to its introduction at his first trial, McCullough objected at this trial to the introduction of the videotaped interview. This issue is preserved for review.

7

An appellate court reviews a district court's decision on a motion to suppress using a bifurcated standard. Without reweighing the evidence, we review the district court's findings of fact to determine whether they are supported by substantial competent evidence. We use a de novo standard to review the ultimate legal conclusion regarding the suppression of evidence. *State v. Robinson*, 303 Kan. 11, 101-02, 363 P.3d 875 (2015).

Because potential *Miranda* violations are inherently fact-specific, some additional facts provide much needed context. When Detectives Sutton and Bundy arrived at Jones' residence on the morning of July 8, 2021, McCullough was present and acting agitated, emotional, and erratic. McCullough kept trying to reenter the residence, he threw his phone on the ground in the front yard, and at one point he lay down on the ground. After a while, officers placed McCullough in the backseat of a police SUV. It was a black and white vehicle with lights and sirens. A plexiglass barrier separated the front and back seats, and McCullough could not exit the backseat unless someone opened it from the outside. Sutton testified that he had previously placed other agitated people in a squad car at crime scenes, though he conceded that neither the distance nor the weather would have prevented McCullough from walking to the police department. McCullough's cellphone and wallet were taken while he sat in the back of the police vehicle. At some point later, law enforcement took possession of McCullough's vehicle.

Patrol officers then drove McCullough to the detective bureau. This required them to enter an underground parking area that is not open to the public. If, at that point, McCullough had asked to leave, the officers would not have allowed him to leave until they talked to a detective. The uniformed patrol officers with badges and firearms then accompanied him in an elevator into the detective bureau and escorted him to an interview room. Again, Detective Sutton testified this was common procedure when taking a witness to the detective bureau. McCullough would have been unable to go home unless the detectives were first consulted. If he needed to move around for any

8

reason, like going to the restroom, he would have been escorted. McCullough was never placed in handcuffs.

McCullough was given a bottle of water and then waited in the interview room for around 50 minutes. McCullough was alone during this time except for a brief interaction with an officer who was in the room for less than two minutes and who asked him some identifying information questions such as his name, height, weight, and social security number. Detective Sutton then entered wearing his "casual uniform," consisting of dress pants, a polo shirt, and a belt apparently containing a handgun. At this point, Detective Sutton knew McCullough had access to the victim's home, there was no sign of forced entry, that he had a girlfriend on the side, and that Jones was likely aware of this other girlfriend. At the motion to suppress hearing, defense counsel attempted to suggest this information would lead Detective Sutton to, at that time, believe McCullough was a suspect, though Detective Sutton testified "there was no reason at that time to believe that he was a suspect" because McCullough did not run from police and kept discussing the Ring camera, which could include incriminating video of the suspect. Detective Sutton had also told McCullough at the scene that he was a witness. That said, Detective Sutton had not identified any other suspects. Sutton testified that prior to reading the *Miranda* rights McCullough "was not a suspect at that time at all." He explained that a domestic partner could be either a witness or a suspect.

Detective Sutton talked with McCullough for around 20 minutes, left the room, reentered, and read McCullough his *Miranda* rights shortly after that. During this time, Detective Sutton did not tell McCullough he was free to go because "[i]t never came up." McCullough still did not have his phone or wallet and did not have a vehicle at the police department. Detective Sutton agreed that McCullough provided incriminating statements prior to receiving the *Miranda* warning, including his whereabouts the night of the shooting and when he left the hotel.

Detective Bundy did not enter the room until after Detective Sutton read the *Miranda* rights. Although McCullough was in the interview room for seven hours, he was subjected to questioning for only approximately 26 minutes before he was Mirandized. He was permitted to leave after the interview terminated, at which point his phone and wallet were returned and he was offered a ride.

The Fifth Amendment to the United States Constitution requires any statements stemming from a *custodial* interrogation or interview to be excluded unless the State proves that procedural safeguards, i.e., *Miranda* warnings, were used to secure the waiver of defendant's constitutional rights. *State v. Guein*, 309 Kan. 1245, 1253, 444 P.3d 340 (2019). Whether characterized as an interview or an interrogation, the critical inquiry for purposes of determining whether *Miranda* warnings were required is evaluating whether the encounter was custodial. A custodial interview "'is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way.'" *Guein*, 309 Kan. at 1253 (quoting *State v. Lewis*, 299 Kan. 828, 834-35, 326 P.3d 387 [2014]). Custodial interviews are distinct from investigatory interviews, which happen "'as a routine part of the fact-finding process before the investigation reaches the accusatory stage.'" *Guein*, 309 Kan. at 1253-54 (quoting *Lewis*, 299 Kan. at 834-35). The overall consideration is whether, "under the totality of the circumstances, a reasonable person would have felt free to terminate the interrogation and disengage from the encounter." *Guein,* 309 Kan. at 1254.

"Nonexclusive factors to consider in making this determination—if an interrogation is custodial or investigative—include: (1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, e.g., whether the person

10

was allowed to leave, was detained further, or was arrested after the interrogation." *Guein*, 309 Kan. at 1254.

Each situation must be evaluated based on its unique facts. Individual factors do not necessarily outweigh others, and the factors are weighed differently. *Guein*, 309 Kan. at 1254.

The district court, however, did not engage in this analysis. It based its legal conclusion at least in part on its finding that officers were following their standard procedures. But that assessment is a non sequitur. The district court erred as a matter of law in failing to evaluate the facts under the proper legal framework, which requires a holistic analysis of the totality of the circumstances. The fact that officers' conduct was consistent with their standard procedures does not constitute substantial competent evidence to support a legal conclusion that an interview was noncustodial. In order to evaluate the claimed error on appeal, we must review the uncontested evidence under the proper framework to determine whether the court nevertheless reached the correct legal conclusion. See *State v. Talkington*, 301 Kan. 453, 472, 345 P.3d 258 (2015) (holding appellate court is "free to reach a de novo conclusion" about whether "factors individually and collectively" suggested that constitutional protections apply, but must "first apply a substantial competent evidence standard to the district court's factual findings").

Here, on the morning of the crime and at the scene, armed officers placed McCullough into the back of a marked police vehicle at the scene of the crime; took his belongings including his wallet, cellphone, and car keys; drove him to a nonpublic garage at the police station; and escorted him to an interview room where he was required to wait for approximately 50 minutes for a detective—a time during which the detective testified that McCullough was not, in fact, free to leave. Once the detective arrived, in plain clothes but armed, he sat between McCullough and the exit and asked him

11

questions for more than 20 minutes before Mirandizing him. McCullough was not handcuffed and the detective's questioning was not aggressive. Although McCullough was told he was being questioned as a witness and not a suspect, some of these questions intimated that boyfriends of victims are who people first think of as suspects. Throughout the questioning, McCullough had no access to his phone, his wallet, or a vehicle. In this context, a reasonable person in this scenario would have assumed they did not have the freedom to leave or terminate the interview.

We recognize that even when a detailed tally of the eight factors may be roughly even, the court must look at the particular facts of each case, and the totality of the circumstances, to determine whether a reasonable person would have felt free to terminate the interrogation and disengage from the encounter. *Guein*, 309 Kan. at 1254; see *State v. Lewis*, 299 Kan. 828, 836-37, 326 P.3d 387 (2014) (interrogation at detective bureau in interrogation room points toward custodial interrogation); *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012) (same); *Lewis*, 299 Kan. at 832, 835 (10 minutes of questioning did not weigh in favor of finding custodial interrogation); *State v. Bridges*, 297 Kan. 989, 1009, 306 P.3d 244 (2013) (30-minute interview suggested noncustodial interview); *Lewis*, 299 Kan. at 836 (one officer present weighed against custodial interrogation); *Warrior*, 294 Kan. at 498 (noting two officers in the interview room did not influence the analysis); *Lewis*, 299 Kan. at 837 (lack of cellphone and wallet favored custodial interrogation).

Again, because the record suggests no dispute as to the facts surrounding the interview, our ultimate concern lies with the district court's legal conclusion derived from those facts. Considering the circumstances as a whole in light of the factors and our precedent applying these factors, we conclude that the evidence does not support the district court's conclusion that a reasonable person would have felt free to leave if they had been in McCullough's shoes. The district court erred when it did not suppress this part of McCullough's interview.

We next turn to the question of whether the error in failing to suppress McCullough's pre-*Miranda* statements was harmless.

*Harmlessness*

When a constitutional right is implicated and an error is found, "the party benefitting from the error" must prove "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record," i.e., that there "is no reasonable possibility that the error contributed to the verdict." *State v. Swindler*, 296 Kan. 670, 684, 294 P.3d 308 (2013) (citing *State v. Ward,* 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011], *cert. denied* 565 U.S. 1221 [2012]).

McCullough argues that the error cannot be considered harmless because (1) the first jury hung; (2) the evidence in the case was weak; (3) the statements that he argues should have been suppressed (i.e., that he did not leave the hotel that night) contradicted other evidence, which the State emphasized in closing and rebuttal to make him look guilty.

In particular, McCullough points to harm flowing from two categories of statements: (1) his claims that he was at Rucker's hotel room all night, which were contradicted by the State's surveillance footage; and (2) his statement that he did not have any guns, which was contradicted by several witnesses. The State highlighted both of these evidentiary contradictions in closing and rebuttal.

Notably, McCullough did not make any statement about his ownership of guns during the pre-*Miranda* portion of the interview. He did assert that he was with Rucker all night. But he *also* told the detectives he was with Rucker all night *after* being read his rights. As we discuss below, because there was no error in the admission of post-*Miranda*

13

statements, identical evidence of McCullough's contradictory statements was permissibly in front of the jury through the later portion of the interview and other testimony.

Further, despite McCullough's argument to the contrary, the State presented strong evidence at trial. The State submitted video evidence of McCullough leaving his hotel room and driving Rucker's car to an area very near Jones' residence. A separate video catches a figure move in and out of the residence several times. This occurred around the time T.T. heard the first loud noise downstairs. And another series of videos depicts Rucker's car heading back to the hotel shortly after, with McCullough finally entering the hotel around 2 a.m. The State also presented evidence of the contentious relationship between Jones and McCullough, illustrated by angry text messages and a phone call in the hours leading to the murder where Jones said she was going to take their daughter and move to Texas. Moreover, there was no evidence of a break in or burglary and McCullough had a key to the house. Collectively, this strong—albeit circumstantial—evidence of motive, opportunity, and proximity to the crime scene at the time of the crime demonstrates that the error in admission of McCullough's pre-*Miranda* statements, which were also properly before the jury by virtue of his post-*Miranda* statements, is harmless beyond a reasonable doubt. Cf. *State v. Pepper*, 317 Kan. 770, 779, 539 P.3d 203 (2023) ("even the gravest crime can be proved with circumstantial evidence and the logical inferences properly drawn from that evidence").

We acknowledge that a prior jury (which also was given the entirety of the video interview) reached a hung verdict. McCullough suggests that if the contradicted statements about his whereabouts had not been introduced, the State would not have been able to rely on this discrepancy to discredit him. But this alone is not determinative, and instead the court must consider the State's case when evaluating harmlessness. See *State v. Walker*, 308 Kan. 409, 416, 421 P.3d 700 (2018) ("Thus, we acknowledge prior juries have hung, but we do not find it determinative of the strength of the State's case here. We must consider the entirety of the State's case to determine its strength.").

We are satisfied that the error in admission of McCullough's pre-*Miranda* statements was harmless.

II.    *McCullough Did Not Unambiguously and Unequivocally Assert His Right to Silence and There Was No Error in the Admission of Post-*Miranda *Statements*

McCullough next argues that, during the interview, he asserted his right to silence but officers continued to ask him questions. McCullough claims that the police thus violated his rights against self-incrimination, including the right to remain silent, under the United States Constitution and the Kansas Constitution Bill of Rights.

The alleged invocation occurred shortly after Detective Sutton read McCullough his *Miranda* rights. Prior to reading the *Miranda* rights, Detective Sutton asked McCullough whether he would consent to a search of his cellphone. Detective Sutton then read the *Miranda* rights, and the following exchange occurred:

| | |
|---|---|
| "Sutton: | And you can decide at any time to answer, exercise these rights and not answer any questions, um, or make any statements. |
| "McCullough: | Mhmm. |
| "Sutton: | And it's just, we can sit here. I wanna have a conversation with you about the whole Dion[e] thing and about the comings and goings and stuff— |
| "McCullough: | Mhmm. |
| "Sutton: | —and then, um, get in a little more, okay? Do you wanna talk to me more about that? |
| "McCullough: | No, 'cause I don't know where this is going. |
| "Sutton: | Huh? |
| "McCullough: | I don't know where this is going, you know? |
| "Sutton: | How this is going? |
| "McCullough: | Right. |

"Sutton:              Well, it's going where we can figure out what's going on.

"McCullough:          (Inaudible 1:45:28) somebody—

"Sutton:              And you were telling me that she, she's at her house with her kids, basically, your kids and her, her son. She goes out and gets food, and then you're gone and you're, you're just doing—

"McCullough:          For the whole night."

At the suppression hearing, Detective Sutton testified that he took McCullough's alleged assertion to mean "[t]hat he needed more clarification as to what my position was, where I was going with the interview." Detective Sutton thought McCullough "wanted to know more information before giving a statement."

When considering a defendant's motion to suppress, an appellate court reviews the district court's factual findings for substantial competent evidence. *State v. Aguirre*, 301 Kan. 950, 954-55, 349 P.3d 1245 (2015). The district court's legal conclusions are reviewed de novo. *Aguirre*, 301 Kan. at 954-55.

McCullough raised this issue prior to his second trial and the district court held the assertion was equivocal; he also objected at trial. The issue is preserved for review.

"An accused's right to remain silent during a custodial police interview arises under both the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights." *State v. Flack*, 318 Kan. 79, 90, 541 P.3d 717 (2024). When a suspect invokes the right to silence, this invocation must be "scrupulously honored" and the interview must end. *Aguirre*, 301 Kan. at 954. However, an invocation is only effective if it is unambiguous and without equivocation. *Flack*, 318 Kan. at 90. The context of the invocation informs this determination. 318 Kan. at 90. Reviewing courts consider whether an invocation would be unambiguous to a reasonable officer, not to the individual making the invocation. 318 Kan. at 91. And statements made

after an invocation cannot be used to retroactively cast doubt on the clarity of that invocation. *State v. Younger*, 320 Kan. 98, 116, 564 P.3d 744 (2025).

Here, the asserted statement occurred in the context of Detective Sutton asking McCullough if he wanted to talk about a specific topic: "the whole [Dione] thing and about the comings and goings and stuff." With that initial context, Sutton then asked McCullough if he wanted to talk to Sutton "more *about that*." (Emphasis added.) McCullough responded with, "No, 'cause I don't know where this is going."

McCullough argues his use of the word "no" was unambiguous and clear. He takes issue with the district court's conclusion that the phrase "'cause I don't know where this is going" qualifies the "no," suggesting instead that a "no, because" is not a qualification, but an explanation.

Given the context, the distinction McCullough draws is one without a difference. The State is correct that the invocation was ambiguous and equivocal: a reasonable officer could interpret the alleged invocation in at least three ways.

First, when read in context, the statement could simply signal "uncertainty and confusion as to what Detective Sutton was asking," as argued by the State. McCullough stating that he did not know where the questioning was going could be interpreted to mean that a clarification from Detective Sutton was necessary for McCullough to determine if he wanted to move forward in the discussion. Based on Detective Sutton's testimony, this is how he interpreted the statement.

Second, as the State points out, a reasonable reading of McCullough's response of "no" is that the "no" was directly responding to a specific topic: Dione and his comings and goings that night. That is, McCullough was not stating he wanted to stop the interview with Detective Sutton; instead, he was stating he did not want to talk about

17

Dione, his comings or goings, or both. See *Burno v. United States*, 953 A.2d 1095, 1101 (D.C. 2008) (finding alleged invocation of the right to silence ambiguous because his "answers thus were the classic illustration of a suspect willing to answer some questions but not others, conveying an at least ambiguous message to interrogators about his desire to remain silent," and collecting cases and other authorities on that point).

Third, McCullough's statement of "no" could be read as a complete and totalizing "no," meaning he did not want to continue the discussion at all, and the "because" simply explained why.

A statement that can reasonably be interpreted in more than one way is, by definition, an ambiguous statement. McCullough's statement, read in context, was ambiguous as to whether he was asserting his right to silence. Because it was ambiguous, and because officers are not constitutionally required to ask clarifying questions, the district court did not err in denying McCullough's motion to suppress any statements made after the alleged invocation. See *Flack*, 318 Kan. at 94 (suggesting ambiguous statements are open to different interpretations); *State v. Walker*, 276 Kan. 939, 945, 80 P.3d 1132 (2003) (noting that, when the accused makes an ambiguous statement about asserting his or her right to remain silent or to speak with counsel, it is good practice for the interrogator to ask clarifying questions but is not required).

Because we discern only one error and have concluded that it was harmless, we do not engage in an analysis of cumulative error.

We affirm the judgment of the district court.

LUCKERT, J., not participating.

18