IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,040

STATE OF KANSAS,
*Appellee*,

v.

QUINTON MOORE,
*Appellant*.

SYLLABUS BY THE COURT

1.

A person's mention of his or her right to counsel during a law enforcement interview does not necessarily constitute invocation of that right. Invocation of the right to counsel must be unequivocal.

2.

A district court judge does not err in refusing to give voluntary intoxication instructions on first-degree premeditated murder and intentional second-degree murder counts, when the evidence before the jury cannot support the defendant's impairment at the time of the crime. Such instructions would be factually inappropriate.

3.

A prosecutor errs when he or she even briefly speculates without supporting evidence on a defendant's motive to commit murder. But such an error is harmless when the evidence of the defendant's guilt is overwhelming—including the defendant's confession to the crime and its motive, witness testimony consistent with the major points of that confession, and other corroboration.

1

4.

The cumulative error doctrine does not apply when only one error has been identified by an appellate court.

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed August 21, 2020. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.:  A Reno County jury convicted Quinton Moore of first-degree premeditated murder for the 2017 shooting of Clarence "Avalon" Allen. Moore raises four challenges to his conviction:  (1) the district court judge should have suppressed evidence of his incriminating statements made during his police interview; (2) it was error to refuse to give voluntary intoxication instructions; (3) the prosecutor committed error in closing argument; and (4) cumulative error requires reversal.

We hold there was a single instance of prosecutorial error during closing argument, but the error was harmless beyond a reasonable doubt. We thus affirm Moore's conviction.

FACTUAL AND PROCEDURAL HISTORY

This case is characterized by multiple evolving stories from the defendant and several witnesses. We detail the evidence here to support our analysis of Moore's issues on appeal, particularly his insistence that any and all errors warrant reversal.

After responding to a 911 call the morning of September 22, 2017, police found Allen dead from multiple gunshot wounds in a Hutchinson home. The same morning, police identified Moore as a suspect. Police located Moore at a local hospital. When Moore was discharged later that morning, he agreed to go with police to the Hutchinson Law Enforcement Center for questioning.

Detective Curtis Black interviewed Moore for about four and one-half hours. Initially Moore denied involvement in the shooting, but he eventually confessed to buying a gun about a month earlier and shooting Allen. The State charged Moore with first-degree murder.

Before trial, Moore moved to suppress the statements he made during his interview with Black. Moore argued that police violated his *Miranda* rights by continuing to question him after he said, "Well, I guess it's lawyer time now then," and, later, "I'm done, alright." The State opposed the motion. It argued that Moore did not unambiguously or unequivocally make a request for counsel.

The district court judge held a hearing on the motion to suppress. Black testified for the State. Black explained that he went over a *Miranda* waiver with Moore and that Moore agreed to waive his rights and speak with Black.

3

Moore admitted to Black that he had used methamphetamine the previous morning, and he blew a .089 or .087 on a breath alcohol test an hour or two before the interview. Black provided Moore with water and a quesadilla from Taco Bell and asked Moore if he was too intoxicated to be interviewed. Moore said he was not intoxicated. Black testified that at one point during the interview Moore said "it's lawyer time" but "continued to speak" about the events at issue.

The State put a videotape and a transcript of Moore's interview with Black into evidence. They included a more complete version of the exchange about "lawyer time."

"DETECTIVE BLACK: So why did you shoot Avalon? [Allen's nickname] We're not here—you're not new to this. You know what's going on. You know what happened. You wouldn't be sitting right here, right here in front of me.

"MR. MOORE: Okay. First of all when would I have shot Avalon?

"DETECTIVE BLACK: That's why you need to tell me.

"MR. MOORE: I said when would I? When did he get shot?

"DETECTIVE BLACK: I need to know from you.

"MR. MOORE: So when did he get shot?

"DETECTIVE BLACK: You're the only one that can tell me that.

"MR. MOORE: How am I the only one to tell you that if I didn't know he got shot first of all and how did Jessica know he got shot?

"DETECTIVE BLACK: 'Cause you told her. You told her what you did and she didn't believe you.

4

"MR. MOORE:  Well, I guess it's lawyer time now then 'cause I don't know what the fuck she's got going on, and 'cause like me and Avalon, we don't even get into it like that as far, we don't go as far as I want to shoot him. You know what I'm saying. We get into little arguments and shit but they don't even last. Like, we argue, 15 minutes later we're cool. Shaking hands, he goes his way, I go mine. You know what I'm saying. Like the biggest altercation we had was the other night when he punched me in the face, whatever. I ain't going to let that go, like, I say, it didn't really [faze] me. You know what I'm saying? Like, I was drunk, talking shit. I got up, I said I was going to leave. He said, no, you ain't got to fucking leave; you know what I'm saying? Be your homey, whatever, you know what I'm saying. We could work this shit out, we going to talk about it, whatever. (Unintelligible.)

"DETECTIVE BLACK:  And that was a week ago?

Ten minutes later, Black and Moore continued:

"DETECTIVE BLACK:  You do know.

"MR. MOORE:  No, I don't.

"DETECTIVE BLACK:  Why did you shoot Avalon?

"MR. MOORE:  I'm done, all right. Keep talking about shot fucking Avalon. I wouldn't have a reason to fucking shoot Avalon.

"DETECTIVE BLACK:  I think you do. I think you believe he was molesting Jessica's kids. I think you've gotten close to them. And you're like a father figure in that house. You pay the bills, you cook, you clean, you feel that need and that fatherly duty to protect those kids. I understand that.

"MR. MOORE:  He was still, he's their father so, shit, I don't, I don't try to play the role with him."

5

The district judge found that "[t]aken in context of the conversation, the Defendant is indicating each side has stated their position and unlikely to change their positions, so 'it's lawyer time' or time to proceed to court." The district judge ruled that the statement was not an unequivocal request for counsel and that Black did not violate Moore's *Miranda* rights by continuing to question him. Likewise, the district judge concluded that, in context, Moore's "I'm done" statement was not an "unequivocal request for the interview to cease." The district judge denied Moore's motion to suppress.

Moore's case proceeded to a jury trial. Sedgwick County Deputy Coroner Jamie Oeberst testified that Allen had seven gunshot wounds.

Detective Daniel Styles testified that he and another officer entered the home where Jessica Crowe and her mother, Sara O'Neal, had found Allen dead on a bed. Several shell casings surrounded the body, but there was no gun in the room.

Another officer reported to Styles that he had found a pair of sandals on the street near the house. Styles photographed and collected the sandals. He noticed apparent wet blood stains on the shoes, which were later swabbed for DNA.

Officer Robert Winslow testified that he spoke with Crowe and O'Neal at the house after police arrived.

O'Neal told Winslow that Crowe had come to O'Neal's house across town and said that "somebody had emptied a clip into her boyfriend's head."

According to Winslow, Crowe told him she had gone for a walk after midnight. After she walked down the street for a while, she used her cell phone to call her brother,

6

Steven Griffith, Jr., about 1:40 a.m. Griffith picked her up and drove her to O'Neal's house. At O'Neal's, people "were sitting on the front porch just smoking and talking and then a male walked up to them, made some concerning statements." Crowe did not identify this man.

Winslow described Crowe's three somewhat distinct accounts of what the man said:

> "The first time she said the, the male walked up and said I just shot that bastard in the face. And then the second time we talked about it she said that he just shot him in the face. And then the third time we talked about it she said that he told her I just shot that fucker in the face."

After the "concerning" statement, according to Crowe, she and O'Neal drove back to Crowe's house and found Allen's body.

While Winslow was talking to Crowe, a neighbor came up and asked, "[W]here's Q?" This apparently surprised Crowe. Winslow asked who "Q" was. Crowe hesitated and then said "Q" was Moore. When Winslow asked who Moore was, Crowe told him that Moore lived with her and Allen at the house. When Winslow asked where Moore was, Crowe "didn't really respond."

Officer Cory Schmidt testified that he had also spoken with Crowe and O'Neal at the house, after they had spoken with Winslow.

O'Neal told Schmidt that Crowe was at O'Neal's house all night, and the pair went over to Crowe's house to check on Allen only because he was not answering his phone.

7

Crowe told Schmidt that she "didn't tell that other first officer the truth." Crowe told Schmidt that the previous evening she had seen Moore drunk, sitting in the living room. Crowe said Moore displayed a gun and said he was "going to kill this, quote, 'N' word." Crowe asked if he meant that he was going to kill Allen. When he said yes, Crowe urged him not to kill Allen; then the pair went across the street to Katherine Hendricks' house. Moore left Hendricks' house and went back to the house he shared with Crowe and Allen. Then, according to Crowe, she and her brother, who was also at Hendricks' house, heard gunshots. Moore then returned to Hendricks' house and said "they all needed to leave." According to Crowe, Moore told her he had "emptied the clip into [Allen's] face." Moore, Crowe, and Griffith then left Hendricks' house.

Lieutenant Dustin Loepp testified that he spoke with Crowe the morning after the murder about photos she had discussed the night before with Hendricks. Crowe described one of the photos as "a very blurry picture that was kind of bright and it had what appeared to be a, a big child's face in the center of the picture." Crowe told Loepp she believed Allen had been molesting her kids. The night before the murder, Crowe had asked others at Hendricks' house what they thought a photo showed. Crowe thought the picture might show Allen's penis, with two of her children in the background. Loepp photographed the picture on Crowe's phone, and his photo was admitted into evidence as Exhibit 24 at Moore's trial.

When Loepp interviewed Crowe, he said, Crowe recounted her story about seeing Moore in the living room. She had heard him drop something and then discovered it was a gun. She repeated Moore's statement that he would kill Allen, and she said that she and Griffith tried to get Moore to leave Hendricks' house, but Moore said he needed to go get his shoes. While Moore went back for the shoes, she heard "five or six" gunshots. Then Moore came running back. Once she, Griffith, and Moore had left Hendricks' house and gone to O'Neal's house, Crowe said, Moore told her he had shot Allen and Allen "fell

back." Loepp also testified that Crowe told him Moore was "always drunk"; at one point the day before the shooting, she said, she saw him with a pint of vodka.

Loepp also recounted a November 2017 interview with Griffith. Griffith said that Crowe called him for a ride and that he went to pick her up at Hendricks' house. There, he said Crowe asked him repeatedly to get Moore away from their house. Griffith had a conversation with Moore; Moore said that Allen was a "bitch-assin' nigger" and that he thought Allen "had molested his kids." Griffith also said Moore agreed to leave but said he needed to get his shoes. When Moore went back to the house he shared with Crowe and Allen, Griffith heard gunshots, and then Moore came outside. After Griffith took Crowe and Moore to O'Neal's house, the three went to Griffith's bedroom. Crowe started crying, and, when Griffith asked what was wrong, Moore replied, "I killed that nigger." Griffith told Loepp that he had left O'Neal's house "on at least two occasions" during the early morning hours after the murder. He was gone for about an hour the first time, then came back for a period of time. He did not return after leaving the second time. Griffith said he did not give any clothes to Moore.

On cross-examination, Loepp admitted police did not test the kitchen or bathroom at Crowe's house for blood. He also said they did not swab Crowe's hands for gunshot residue because, at the time of the shooting, the KBI lab lacked the ability to run such a test. Police also did not test for the presence of blood at O'Neal's house. He said an earlier investigation of allegations that Allen molested Crowe's children did not develop probable cause to support an arrest.

Detective Jessica Kelly testified that she interviewed Griffith the morning after the murder, and he gave Kelly multiple versions of events of the night prior. First, he said Crowe called him between 1:30 a.m. and 2:00 a.m., asking him to pick her up at Hendricks' house. He showed up and Moore was with Crowe; he took the pair back to

O'Neal's house. After 5 to 10 minutes at O'Neal's house, Crowe's demeanor changed and she became teary. Moore said, "[H]e's dead." Griffith left at this point and did not come back until law enforcement asked him to do so.

In Griffith's second version of events, he said that he got a soda from a convenience store after he left O'Neal's house. Kelly later pulled contemporaneous surveillance footage from that convenience store, and it did not show Griffith.

Later, after detectives searched Griffith's phone, he amended his story again. He said that he had texted Crowe, saying Allen was "very much alive." He deleted this message because he "didn't want any part of what was going on." He denied having any part in Allen's shooting or in the disposal of the gun used, which had been found in a trash can behind O'Neal's house. When asked about a sheet in which the gun was wrapped, Griffith said that another part of that sheet could be found either in O'Neal's house or in his car. When he gave Moore and Crowe a ride to O'Neal's, Griffith said, Moore had been wearing a black jacket and shorts. He did not recall whether Moore was wearing shoes. Griffith said he did not have a good relationship with O'Neal, Crowe, or Allen.

Two months later, when Kelly interviewed Griffith a second time, he again changed his story. This time he said he went to a different convenience store after leaving O'Neal's house. He admitted that the sheet the gun was wrapped in came from his bedroom, and that "he still had the other part of that sheet that matched it." He also admitted his DNA could be on the gun because it had been wrapped in his sheet. He nevertheless denied knowing about the gun. Griffith said he had spoken to O'Neal, who said that she was giving both Moore and Crowe a ride from her house to theirs, when Moore "admitted to shooting" Allen. O'Neal told Griffith that she then told Moore to get out of her car.

10

When Griffith himself testified at trial, he described Crowe asking him to pick her up and take her to O'Neal's house. He drove to Hendricks' house, where Crowe was on the porch speaking with Moore. When Griffith said it was time to leave, Moore said he was going back to Crowe's house to get his shoes. After "several minutes went by," Griffith and Crowe heard "what sounded like gunshots, another several minutes probably went by," and Moore came walking back. Griffith said there were six or seven gunshots. He did not pay attention to whether Moore was wearing shoes when he returned. Then Griffith drove Moore and Crowe to O'Neal's house; Crowe and Moore did not talk much in the car.

Once at O'Neal's house, Griffith testified, when the three had gone into Griffith's bedroom, Moore "was talking about how he beat all these murder cases prior to this one" and Crowe "looked like she was going to cry." When Griffith asked Crowe what was wrong, Moore said that he "killed that nigger." Griffith said he left after hearing this; he said he went to a Kwik Shop to get a drink and did not return home until police had come to O'Neal's house.

During his testimony, Griffith also admitted that the sheet the gun was wrapped in came from his bed, but he said he did not dispose of the gun and had never seen it. The last time he saw the sheet, it was in a bag of dirty laundry in his closet. He admitted he told detectives the sheet could have been in his car because he was in the process of moving. Griffith said he had not spoken to Crowe since the morning after the murder. He repeated that he did not have a good relationship with Crowe and confirmed that he had called her a "paranoid schizophrenic."

When Crowe testified at Moore's trial, she said she lived with Allen, who was her boyfriend and the father of her children. Moore lived with them. She had never seen

Moore with a gun before the time of the shooting and told him to "go outside" when she discovered him with it. Moore was "pretty drunk" at the time. Crowe said that Moore said something along the lines of "somebody should or somebody is going to" kill Allen, but "it wasn't like a definite" commitment that he was going to kill Allen. Crowe admitted that she "had been doing drugs" when this statement was made.

Because Crowe wanted Moore out of the house with the gun, they went across the street to Hendricks' house and sat on the porch. Moore was wearing a shirt, shorts, and socks, but Crowe could not remember if he was wearing shoes. Before reaching Hendricks' house, Crowe called Griffith and asked him to come pick her up.

Griffith pulled up to Hendricks' house, and Crowe went to the car to talk with him. According to Crowe, while she talked with Griffith, Moore went across the street to Crowe's house, alone, to get his shoes. Crowe said that "within seconds" of Moore entering the house, she heard "a bunch" of gunshots. After the gunshots, Moore came running back across the street to Hendricks' house so fast that "his shoes were in the street." Then Crowe and Moore got in Griffith's car and went to O'Neal's house. Crowe tried to ask Moore what he had done, but Moore told her "to be quiet and not talk about it."

When they reached O'Neal's house, Crowe testified, they went into Griffith's bedroom. Crowe had Moore use bathroom cleaner to "wash away any evidence" on his hands. Moore removed the clothes he was wearing, and Crowe put them in a bag in the closet. Crowe was not sure if Moore had a second set of clothing on under the clothes he had removed, or if he got clothes from Griffith. Crowe said she had "no idea" what happened to the gun.

Crowe admitted at trial that she had been diagnosed with a "mental defect," which doctors previously thought was schizoaffective disorder but now thought was bipolar disorder. She said she was previously prescribed medication for her condition but it did not work; she instead self-medicated with methamphetamine. She said she was struggling to recall the events of the night of the murder accurately while testifying. She said she was sober at trial and her memory was better when she was using.

On cross-examination, Crowe explained that she, Allen, and their children moved into the home with Moore, but her children had been taken by the State before the shooting. Earlier in the evening before Allen was shot, Crowe and Moore had gone to Hendricks' house. While there, Crowe showed Hendricks and another woman photos that "were concerning" to Crowe. Allen was in bed when Crowe and Moore returned to their house about 10 p.m. Allen asked Crowe to join him in bed and have sex, but Crowe took a shower instead.

Crowe admitted lying to the first police officer who spoke to her, including her story that a random man had walked up to her and announced that he "shot that fucker in the face." Defense counsel asked if Crowe knew Allen had been shot in the face. Crowe said "I think so. I don't know. I just made that story up."

Crowe also said that she thought Griffith hid the gun at O'Neal's house while she and Moore waited in Griffith's room. She said that while she and Moore were at O'Neal's house, Griffith called or texted her to say Allen was still alive. She said she awakened O'Neal by screaming at Moore, because she thought Griffith and Moore were playing some "kind of game." O'Neal asked what was going on and Crowe told her she "thought he killed [Allen] and [Allen's] alive and we have to go over there because he's going to beat me up." She said she and Moore had stayed at O'Neal's house for "hours," probably until 6 a.m. She denied seeing blood on Moore or his clothes.

13

Crowe also testified Moore never explicitly said he shot Allen, and she said she could not remember telling Schmidt that Moore claimed he emptied a whole clip into Allen's face. Yet she said that whatever she told Schmidt was the truth and that she had a hard time remembering the day of the murder because she "did more drugs that night afterwards than [she] had ever done in [her] whole life." She also said that she had told the truth at Moore's preliminary hearing but that she was high that day. Crowe was directed to read to the jury from her preliminary hearing testimony. At that hearing, she had testified that "Moore told [her] immediately after [she] heard the shots that he had unloaded his gun into [Allen's] face." Also at the preliminary hearing, she had testified she did not call the police upon hearing the gunshots because of Moore's statement.

Crowe said that the night of the murder she had showed Moore a photo from her phone of "a penis and children's faces behind it." She said it was her children in the picture. But Crowe said she did not recognize Exhibit 24. She said there were "more pictures than just this" and other photos showed Allen was abusing her kids.

O'Neal testified that she remembered Griffith telling her the night of the murder that he was going to Crowe's house because Crowe and Allen had a fight. About 5 a.m. that morning she woke up to the sound of a screen door banging. She saw Moore and Crowe in the front yard and asked Crowe what was going on. Crowe said Moore needed to leave. So O'Neal got up, got ready for work, and began driving Crowe and Moore to their house. Moore was "mumbling" and "talking to himself" in the backseat. When Crowe told O'Neal that Moore "said that he emptied a clip in [Allen/s] face," O'Neal stopped the car and told Moore to get out. The car was near the hospital at this point.

After Moore left the car, O'Neal and Crowe went to a convenience store, then back to Crowe's house. O'Neal agreed to go into the house with Crowe. Crowe went into the

14

bedroom, then said, "[O]h, my God, he did that shit." O'Neal went into the bedroom and saw Allen lying on the bed covered in blood. The two women left the house and called 911.

Hannah Thornton testified at Moore's trial that she was staying at Hendricks' house on the night of the murder. She saw Moore with a black gun magazine tucked into his waistband. Moore and Crowe had shown Thornton photos on a phone, and Thornton recalled Exhibit 24 as one of them. She said she could make out Crowe's son's face, and, she believed, Allen's face. Thornton testified that she "thought it was very telling what [Allen] was doing with his kids." Thornton also said she saw Moore drinking the day before the murder and, at one point, saw him "passed out." After the murder, she said, Crowe's story changed "many times." And Crowe mentioned at one point that Moore was "taking the rap" and that she had had an "innocent man locked up." Once, Crowe told Thornton that Allen was "already dead when she got out of the shower."

William Blake also testified at Moore's trial. He said that he gave Moore a ride on the day of the murder and that Moore showed him a gun with a black handle tucked into his pants.

Black testified at trial about his interview of Moore at the police station, and the district judge admitted the videotape of the interview over Moore's objection "based on . . . prior motions." During the interview, which was played for the jury, Moore repeated several times that he did not shoot Allen and said his fingerprints and DNA would not be on the gun because he had not touched it. Moore told the police to talk to Crowe and said he had not been in the house without her. He also said he did not own a firearm. Meanwhile, Black continually insisted that Moore shot Allen. He asked Moore why he would do so, suggesting Allen's suspected pedophilia or violent history as motives. Moore also rejected Black's suggestion that he was romantically interested in Crowe, and

15

that this was a "lovers' quarrel" because Moore "wanted to be with [Crowe] and it wasn't going to happen unless [Allen] was out of the way."

When Moore eventually confessed during the videotaped interview to shooting Allen, he said that he bought a ".40 Glock" from a man in an alley about a month before the murder. Although he did not think Allen successfully molested his daughter, he did believe Allen tried to do so. He "lost it" when this came to light. When asked how his sandals ended up in the street, he mentioned leaving the house after shooting Allen, but his further explanation was unintelligible on the videotape.

On Black's cross-examination, he testified he administered a preliminary breath test to Moore that showed alcohol present in his system but did not say how much. Moore's counsel suggested Black had fed Moore the details of the shooting while interrogating him. Black admitted that he had told Moore falsely that his fingerprints and DNA were on the gun. Law enforcement tested the gun for only one of those things, and the test performed came back negative. But Black testified that Moore's demeanor changed partway through the interview, when Moore asked, "[I]f I did know what happened, what is that going to change?"

Black further testified that "Glock" is a brand name used by some to refer to all semiautomatic handguns. Moore said he left the gun wrapped in a sheet on a bed at O'Neal's house; Black had already told Moore the gun was found in a sheet. When Black asked Moore to reenact the shooting, Moore did so, miming holding a "gun" 6 to 12 inches from Allen's head. Moore denied touching Allen's face with the gun.

Black also asked Moore about changing clothes at O'Neal's house. Moore said that he always wore two sets of clothes and just took the outer set off. Black said that police "identified the shirt [Moore was wearing when brought into custody] as belonging to

16

Steven Griffith." He also said he thought the socks Moore was wearing came from O'Neal's house. Black took a white t-shirt with a design on it, black shorts, and other clothing Moore was wearing when arrested into evidence.

Officer Dayton Gates testified he found Moore at the hospital around 6:45 a.m. According to hospital staff, Moore checked in at 6:27 a.m. for chest pain. Hospital staff administered a "banana bag" to Moore; Gates did not know exactly what that was. Moore was wearing a white t-shirt, black shorts, black socks, and no shoes. After Moore was discharged from the hospital, he agreed to go with Gates to the Law Enforcement Center. Gates did not observe Moore to be intoxicated in any way.

Lance Fairchild, the Hutchinson police evidence custodian, testified that police collected a plain white t-shirt, black shorts, black socks, gray underwear, and a white t-shirt with a design on it. None of these were submitted to the KBI for testing. He said that police also collected a large jacket, a black t-shirt, a white tank top, different black shorts, sandals, and different black socks. These were submitted to the KBI for DNA testing.

James Newman, a KBI forensic biologist, testified that he tested some of the evidence for blood or DNA. Swabs from the back seat of O'Neal's car were negative, as were swabs from the jacket and the gun. He found blood on the black t-shirt and shorts and the sandals. He said the gun had a "partial mixed DNA profile" on it, but it was of "insufficient quality" to compare to known DNA samples. Similarly, the shirt and shorts had partial DNA profiles that were inadequate for comparison. One of the sandals had enough DNA to test; it contained a mixed profile. Allen's DNA was the "major DNA profile," but the "partial minor DNA profile didn't contain enough genetic information for comparison."

17

Detective Scott Carlton testified that he processed Crowe's house, O'Neal's house, and O'Neal's car parked at Crowe's house on the morning after the murder. He found a Smith and Wesson .40 caliber handgun wrapped in a black-and-white sheet in a trashcan in the alley behind O'Neal's house. He collected six .40-caliber Smith and Wesson shell casings and three bullets from the area near Allen's body.

Carlton said he went to O'Neal's house twice: at about 8 a.m. he found the gun. After he left, O'Neal's house was not secured. Carlton then went back about 10 a.m. because Crowe had told police that clothing Moore wore was in a plastic grocery bag in a closet at O'Neal's house. Police found the bag.

Mackenzie Argo, a KBI firearms examiner, testified that she examined the .40 caliber Smith and Wesson. Argo compared test-fired shell casings from the gun to the shell casings found near Allen's body. She concluded that all the casings found near Allen's body came from the gun.

Moore did not testify. The defense case in chief recalled only Kelly to admit color pictures of O'Neal's and Crowe's homes.

During the instruction conference, Moore's counsel requested voluntary intoxication instructions pertaining to first-and second-degree murder. Moore's counsel argued that

> "there is evidence that Mr. Moore was intoxicated that evening that the murder occurred
> and that he had to go to the hospital. There was law enforcement testi[mony] that Mr.
> Moore was on a banana bag and that Mr. Moore had certainly been drinking, is an
> alcoholic. So we would ask that the court consider that under those circumstances."

18

The State argued that there was insufficient evidence to support such an instruction. The district judge rejected the defense request, ruling "there was evidence of his drinking but no evidence of the fact that he was intoxicated to the point he was unaware of his surroundings and what was occurring." Moore objected to the court's ruling.

During the State's closing argument, the prosecutor detailed evidence tending to support the existence of premeditation. He said:

"With regard to premeditation and considering whether it was thought about beforehand, consider the weapon that was used to kill Clarence Allen wasn't a pair of scissors that was on a night, a bed stand right there. It was something that was brought into the house. It had bullets in it. You've heard testimony about the defendant's admissions as to where he got the gun and having had the gun before. You've heard admissions about the fact he talked about killing Clarence Allen before he did it.

"I mean, Jessica Crowe even says that that's why she got him out of the house. Remember, she testified he dropped the gun, she heard a thud when she was getting out of the shower, she went in and he had a gun and she said what are you doing with that. And he said I'm going to kill Clarence Allen, I'm going to kill Avalon.

"And she was worried about this so she had him go over to [Hendricks'] house and she didn't want him to go back. When he tried to go back and get shoes she tried to stop him. And that was corroborated by the testimony of Steven Griffith.

"Premeditation can also be seen from the killing itself; standing there and pulling the trigger over and over again. Probably one of the pieces of evidence in this case that, that's the strongest on premeditation would be the clothes found in a bag that had blood on them behind a hamper in a closet, hidden behind a hamper in a closet in Sara O'Neal's house. . . . [H]e told Detective Curtis Black I always wear two sets of clothes. I always do. I have two pair of socks, two pair of pants, I had two of everything on. Really? Or, or was one set of clothes throw away clothes so that we could get them shed off and disposed of quickly. You've got evidence in this case that there was premeditation."

19

Later in closing, the prosecutor decried what he called an "American tradition" of criticizing the police and their investigations, portraying them as incompetent. He said:

"Now, there's a common, it's almost become an American tradition to criticize the police. Media, Hollywood's been doing it for years. We did it back in the old days of Batman. Remember, police couldn't solve any crimes in Gotham. We had to put a light up on the cloud, get Batman to come in and solve the crime because the police couldn't do it. We've had cars, robotic cars or dogs or elderly women who write mystery novels, private detectives always have to solve the cases because the police could never do that. That's just become kind of an American tradition to do that.

"In this case the police conducted a good investigation. They reviewed everything. You heard testimony about collecting videotapes and all the things that they did in this case trying to see whether there were any cameras that provided information. The interviews, the, everything that they did to, to document what they were doing. The evidence in this case shows that there was an intentional effort to destroy the evidence in this case, to complicate the police's job. They're trying to make sure it was covered up.

"We've got the fact that the defendant's hands are being sprayed with cleaner to make sure there's no gunshot residue on them. You heard that from the stand. Hidden clothes in a bag with, with blood on them behind a hamper. You could argue flight from the scene. We're not going to stick around there; we're going to get on the other side of town. Disposal of the weapon in a trash can. Efforts to hide the truth. So those are things that did complicate the investigation.

"You know, the evidence has been presented to you, ladies and gentlemen, in this courtroom. You've got it. This is the evidence you have to make this decision on. Based on this evidence the state submits there is proof beyond a reasonable doubt that the defendant committed the crime of premeditated first degree murder."

During the State's rebuttal closing, the prosecutor raised the issue of motive. The prosecutor addressed Black's attempts to discover a motive while interviewing Moore. He said Black asked Moore "40 times" why he shot Allen, and "threw out these theories and he threw out these ideas. The defendant knocked every one of them out of the park saying that's not it. I, I don't know why I did this. I don't know why. That's what he said."

Then the prosecutor addressed some of the motives Black had mentioned, including suspected child sex abuse and Allen's history of being physically violent. Next he said:

> "One, one motive was kind of the elephant walking around the room, that he denied in his interview that he was having a relationship of any kind with Jessica Crowe. But there is some circumstantial evidence or human nature that would support the fact that maybe he was eliminating his competition."

The jury convicted Moore of first-degree premeditated murder. The district judge sentenced Moore to life in prison with no parole eligibility for 618 months.

DISCUSSION

*Denial of Motion to Suppress*

Moore argues that the district judge erred by denying his motion to suppress the evidence from his interview with Black. Before trial, Moore argued the police violated his *Miranda* rights by continuing to question him after he said, "Well, I guess it's lawyer time now then," and, 10 minutes later, "I'm done, all right." The district judge ruled there was no unequivocal request for counsel or to cease questioning. Moore objected to admission of the interview evidence on the same grounds at trial, preserving this issue for our review. See *State v. Berriozabal*, 291 Kan. 568, 580, 243 P.3d 352 (2010).

21

This court's standard of review is often recited.

"When an appellate court reviews a district court's decision on a motion to suppress, it first reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. Substantial evidence means legal and relevant evidence that a reasonable person would find adequate to support a conclusion.

"The district court's ultimate legal conclusions are reviewed de novo, and the appellate court does not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in the evidence. When the significant facts are not in dispute, whether to grant or deny a suppression motion presents a question of law over which the appellate court has unlimited review. The State bears the burden of proving the challenged statements and physical evidence are admissible. [Citations omitted.]" *State v. Guein*, 309 Kan. 1245, 1251-52, 444 P.3d 340 (2019).

This court outlined the constitutional framework for requests for attorneys during custodial interrogation in *State v. Mattox*, 305 Kan. 1015, 1036-37, 390 P.3d 514 (2017):

"The rules governing an accused's constitutional right to counsel during a custodial interrogation are well established. 'The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent.' *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966]). The Kansas Constitution also provides that '[n]o person shall be a witness against himself [or herself].' Kan. Const. Bill of Rights, § 10. A suspect can invoke the Miranda right to counsel at any time. *Walker*, 276 Kan. at 944. Invocation of the right requires, at a minimum, some statement that can be reasonably construed as an expression of a desire for the assistance of an attorney during custodial interrogation. 276 Kan. at 944-45 (citing *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S. Ct. 2204, 115 L. Ed. 2d 158 [1991]). This rule has two components. First, the suspect 'must articulate his desire to have counsel present sufficiently clearly

22

that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' *Walker*, 276 Kan. at 945 (quoting *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 [1994]). This is an objective reasonableness test. *State v. Aguirre*, 301 Kan. 950, 957, 349 P.3d 1245 (2015), *cert. denied* 136 S. Ct. (2016). 'Second, the request must be for assistance with the custodial interrogation, not for subsequent hearings or proceedings.' *Walker*, 276 Kan. at 945 (citing *McNeil*, 501 U.S. at 178).

"Law enforcement must scrupulously honor a suspect's decision to invoke the Miranda rights and cut off further interrogation elicited by express questioning or its functional equivalent. See *Aguirre*, 301 Kan. at 956-57; *State v. Scott*, 286 Kan. 54, 69, 183 P.3d 801 (2008), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). However, 'where a suspect makes a statement which may be ambiguous as to whether he or she is asserting a right to remain silent, the interrogator may, but is not required to, ask questions to clarify or may continue questioning without clarifying.' *Scott*, 286 Kan. at 69-70; see *Walker*, 276 Kan. at 945 ('it is good practice for the interrogator to ask clarifying questions; however, it is not required and the questioning may continue')."

On appeal, Moore argues that "there was nothing equivocal about, 'it's lawyer time now then'" and "'now' conveys a need in the present." We disagree. The statement, considered as a whole and in context, is ambiguous. Any intention to stop the interview until Moore was provided counsel was belied by Moore's complete statement—"Well, I guess it's lawyer time now then 'cause I don't know what the fuck she's got going on." "Well, I guess" is an equivocal introduction, and Moore did not slow or stop talking after he made the entire statement.

This makes Moore's statement much more like the statements this court and the United States Supreme Court have held not to be unequivocal invocations. See *Davis v. United States*, 512 U.S. 452, 462, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) ("[m]aybe I should talk to a lawyer" not unequivocal request for counsel); *Mattox*, 305 Kan. at 1039 ("You

all care if I get a lawyer in here?" not unequivocal request for attorney); *State v. Bailey*, 256 Kan. 872, 879-84, 889 P.2d 738 (1995) (defendant asking interrogating officer if defendant should ask for attorney and whether he needed an attorney not an unambiguous request for counsel). A reasonable law enforcement officer would not understand Moore's statement to be an assertion of his *Miranda* rights. See *Aguirre*, 301 Kan. at 957. A person's mention of his or her right to counsel during a law enforcement interview does not necessarily constitute invocation of that right. Invocation of the right to counsel must be unequivocal.

In his brief, Moore does not address the later "I'm done, all right" statement as a separate invocation of his right to silence or to terminate the interview. Instead, he argues that it was a component of his earlier invocation of his right to counsel. Arguments not briefed are waived or abandoned. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). Moore's statement 10 minutes later, that he was "done, all right," followed by continued talking on his part did not transform his statement that "I guess it's lawyer time now" into an unambiguous invocation of the right to counsel.

The district judge did not err by denying Moore's motion to suppress.

*Denial of Voluntary Intoxication Jury Instruction*

At trial, Moore requested voluntary intoxication instructions for both the first-degree murder charge and the lesser-included crime of second-degree murder. Voluntary intoxication can be a defense to specific intent crimes. *State v. Murrin*, 309 Kan. 385, Syl. ¶ 1, 435 P.3d 1126 (2019); K.S.A. 2019 Supp. 21-5205(b). The judge refused Moore's requests.

This court outlined the relevant standards of review for jury instruction issues in *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 (2014):

       "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012)'.

       "'Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. And if that defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant.'

       "We examine 'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.' [Citations omitted.]"

Because Moore objected to the district judge's refusal to give the instructions, this issue is preserved for this court's review. *State v. Becker*, 311 Kan. 176, 187, 459 P.3d 173 (2020).

"In cases involving the need for a voluntary intoxication jury instruction, we have held that simple consumption of drugs or alcohol is not enough to support the defense. . . . Proof of impairment is also necessary. [Citations omitted.]" *State v. Davis*, 306 Kan. 400, 414, 394 P.3d 817 (2017).

"Evidence of consumption of an intoxicant near the time of the commission of the crime does not automatically render the voluntary intoxication instruction mandatory. . . . A voluntary intoxication instruction is not required unless 'the State or the defendant presents sufficient evidence showing intoxication to the extent of impairing the ability to form the requisite intent.' [Citations omitted.]" *Becker*, 311 Kan. at 188.

Even if we assume that a voluntary intoxication instruction was legally appropriate, the district judge did not err by concluding that the evidence, viewed in the light most favorable to Moore, did not support the instruction, because there was no evidence of impairment negatively affecting the ability to form the requisite intent. See *Hilt*, 299 Kan. at 184. Whether *any* evidence exists is a question of law reviewable de novo by this court. See *State v. Green*, 311 Kan. ___ (No. 118,366, this day decided), slip op. at 37.

The evidence showed only that Moore was a habitual drinker and had been drinking, but he personally denied being intoxicated.

Before the interview with Black, Moore said that his last drink was "a while ago," or "several hours" before. Moore's preliminary breath test showed the presence of alcohol. During the police interview, Moore said he used meth at 9 a.m. the day before the murder. He said that when he went to the hospital around 6 a.m. before the interview, he did so "to detox" because he has pancreatitis. He later explained this meant he "wanted to get [his] stomach checked for pancreatitis, like, tests." While Gates testified that Moore received a "banana bag" at the hospital, he said he did not know what that was; the jury heard no other evidence explaining what a "banana bag" was and what it is used for.

In his brief, Moore points to the following statement from his interview:

26

"DETECTIVE BLACK:  How many times did you pull that trigger?

"MR. MOORE:  I don't know.

"DETECTIVE BLACK:  More than once?

"MR. MOORE:  I think so, there was more than once. I don't know (unintelligible) blackout at the time."

Moore also mentioned "blacking out" one other time during the interview:

"DETECTIVE BLACK:  So why did you shoot Avalon? We really haven't said why it happened. We've kind of talked about circumstances leading up to the point of shooting him, but why?

"MR. MOORE:  I honestly don't know (unintelligible). Just, I don't know. Just lost it.

"DETECTIVE BLACK:  Just lost it?

"MR. MOORE:  I think I just, uh-huh. I don't know. I just kept seeing through to the fire. I got to the point, I don't know, black out, man. (Unintelligible) and then I guess all this shit back and forth arguing and shit just, I don't know, got to the point I couldn't take it no more. (Unintelligible) I don't know. (Unintelligible.)"

Moore did not elaborate on what caused him to "black out," whether it stemmed from excitement, rage, intoxication, or something else. He mentioned "blacking out" only with respect to the number of times he pulled the trigger and in the context of his motivation, saying he saw "through to the fire." He was otherwise able to provide details of his actions leading up to the shooting, indicating he was not so impaired that he was not in control of his faculties. See *State v. Hernandez*, 292 Kan. 598, 607, 257 P.3d 767

27

(2011) ("Hernandez provided a detailed recollection of the events on the night of the offense, which demonstrates that Hernandez' mental faculties were intact."). Moore did not discuss being drunk the night of the murder at all. The only time he mentioned alcohol consumption was to assure Black that he was *not* intoxicated at the time of the interview, and to mention that he was drinking when Allen hit him in the head a week prior.

The evidence from others also did not support the existence of Moore's impairment at the time of the crime. Loepp testified that Crowe had told him Moore had a pint bottle of vodka with him at some point during the "evening/morning. However you want to describe that." But she also said that Moore was a "drunk" and "always had one on him." Crowe testified that Moore "was pretty drunk" when she saw him with the gun when she got out of the shower. Thornton testified that she saw Moore drinking "that day" and "at one point" the day before the shooting, Moore "passed out" in the den at Hendricks' house. This testimony was vague as to time; it did not indicate that Moore was intoxicated at the time of the murder; and it did not indicate that Moore was so intoxicated he could not premeditate or form intent.

We hold that the district judge did not err by denying voluntary intoxication instructions. There was no evidence to support impairment and make the instructions factually appropriate.

*Prosecutorial Error*

Moore next argues that the prosecutor committed "multiple instances" of reversible error during the State's closing arguments. Specifically, Moore alleges the prosecutor erred when he said, "Premeditation can also be seen from the killing itself; standing there and pulling the trigger over and over again," and when he decried the

"American tradition" of "criticiz[ing] the police" and told the jury "the police conducted a good investigation" leading to the evidence the jury needed to convict in this case. Finally, Moore argues the prosecutor erred when he said, with respect to Crowe, "human nature that would support the fact that maybe [Moore] was eliminating his competition."

> "In considering a claim of prosecutorial error, [the court] follow[s] a two-step analysis. [It] first determine[s] whether an error occurred. Second, if an error has been found, [it] evaluate[s] the prejudice [the error] caused to determine whether it was harmless. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). At the first step, error occurs if the appellate court determines the prosecutor's actions or statements 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.' 305 Kan. at 109. A criminal defendant establishes the first prong by establishing the prosecutor misstated the law or argued a fact or factual inferences with no evidentiary foundation. See *State v. Wilson*, 309 Kan. 67, 78, 431 P.3d 841 (2018); *State v. Hilt*, 307 Kan. 112, 124, 406 P.3d 905 (2017)." *State v. Ballou*, 310 Kan. 591, 596, 448 P.3d 479 (2019).

"In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation." *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019).

We address each of Moore's claimed instances of misconduct in turn.

*Premeditation*

This court has explained premeditation in this way:

"'Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life. [Citations omitted.]'" *State v. Haberlein*, 296 Kan. 195, 205, 290 P.3d 640 (2012).

Moore suggests that the prosecutor's statement "misstated the law, eliminating the line between intent and the forethought required for premeditation." Moore compares this case to *State v. Hall*, 292 Kan. 841, 850-52, 257 P.3d 272 (2011).

In *Hall*, a prosecutor argued in closing that defendant Sterling Hall could have "form[ed] premeditation after the pull of the first trigger, because remember, he pulls four times." 292 Kan. at 850. This court held that statement was error because the prosecutor "essentially suggested that premeditation could have been formed instantaneously—a premise repeatedly disapproved by this court." 292 Kan. at 852.

But, as the State correctly points out, the prosecutor's statement Moore challenges here did not "claim premeditation could be formed instantaneously after the Defendant fired the first shot." Instead, the prosecutor was giving the jury a list of all the evidence the prosecutor felt could contribute to a finding of premeditation. This list also included Crowe's account of Moore telling her someone needed to kill Allen, Moore's confession that he bought the gun about a month before, and Moore's story about wearing two sets of clothes. In *State v. Scott*, 271 Kan. 103, 109, 21 P.3d 516 (2001), this court held that "premeditation may be inferred from various . . . circumstances, including: (1) the nature of the weapon used." The prosecutor here did not say that premeditation could be instantaneous. Rather, he pointed to the nature of the weapon used—a gun—and how it was used—fired multiple times. The prosecutor did not make an equivalent to the forbidden argument that premeditation can be formed instantaneously, as Moore claims.

30

*Bolstering and Vouching*

Moore characterizes the prosecutor's "American tradition" remarks as impermissible bolstering and vouching. He argues these statements "appealed to jurors' passions and prejudices:  don't fall for the media or Hollywood angle that police were inept or the State's case was lacking." He also says that the prosecutor's statements that the jury had the evidence to convict "were designed to divert jurors' attention away from the evidence and whether the State had proven its case."

The State argues that these comments were permissible summation of the case, falling within the "wide latitude to craft arguments based on the evidence." *State v. Maestas*, 298 Kan. 765, 777, 316 P.3d 724 (2014). As the State points out, these statements were "strategically designed to blunt the anticipated arguments of defense counsel" who, during closing, "attacked the police's investigation."

The State is correct. These comments from the prosecutor were colorful but far from inflammatory. They did not appeal to jurors' passions or prejudices. Instead, they encouraged jurors to put aside any preconceived notion they might have and look instead to the evidence produced by the actual investigation in this case. These comments were not prosecutorial error.

*Facts Not in Evidence*

Finally, Moore argues that the prosecutor erred when he said in rebuttal:

31

"One, one motive was kind of the elephant walking around the room, that he denied in his interview that he was having a relationship of any kind with Jessica Crowe. But there is some circumstantial evidence or human nature that would support the fact that maybe he was eliminating his competition."

We agree Moore is correct that this statement was error because the prosecutor argued facts that were not in evidence. "[I]t is clearly improper for a prosecutor to state facts that are not in evidence." *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017). None of the evidence at trial suggested the existence of a romantic relationship between Crowe and Moore, or even that Moore had romantic designs on Crowe unknown to her. Indeed, the only evidence the jury had before it on this subject was Moore's explicit denial during his interview with Black of any such relationship or desire.

Having identified this comment as error, we next move to the question of harmlessness. The State must establish "beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict." *State v. Sherman*, 305 Kan. 88, Syl. ¶ 8, 378 P.3d 1060 (2016). The State argues that the overwhelming nature of the evidence against Moore means that it can meet the appellate harmlessness standard.

The State is correct. The prosecutor's unsupported speculation on Moore's motive to kill Allen was error, but the evidence against Moore qualified as overwhelming. Although it is true that the accounts of several witnesses evolved over time, Moore ultimately confessed to committing the crime at a time and in a manner consistent with the major points of those accounts. Other nontestimonial evidence collected by law enforcement corroborated the chronology of events the witnesses and Moore's confession described, as well as the immediate aftermath of the crime. This information included the

recovery of Moore's shoes, clothes, and the murder weapon. In Moore's interview with Black, he identified his motive to kill Allen as anger at Allen's attempt to molest Moore's daughter, most recently stoked by his viewing of the photographs Crowe had shown him. All of this was more than plenty to support the jury's verdict, in spite of the prosecutor's momentary misstep during closing argument.

*Cumulative Error*

Finally, Moore argues that this court should order a new trial on the basis of cumulative error. Because we have identified only one error, the cumulative error doctrine does not apply. "One error cannot support reversal under the cumulative error doctrine." *State v. Carter*, 284 Kan. 312, 332, 160 P.3d 457 (2007).

CONCLUSION

The district judge did not err by denying Moore's motion to suppress and his request for voluntary intoxication instructions. Although the prosecutor committed one error during closing argument, the error was harmless. The cumulative error doctrine does not apply in this case. We therefore affirm Moore's conviction.

MICHAEL E. WARD, Senior Judge, assigned.[1]

* * *

---

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 121,040 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

ROSEN, J., concurring:  I agree with the majority's conclusions in this case and nearly all of its analysis. I write separately only to make my position clear on issues dealing with affirmative defense instructions.

The majority has concluded there was no evidence indicating Moore was impaired at the time of the crime and, consequently, a voluntary intoxication instruction was not factually appropriate. I agree with this. However, I part with the majority's discussion on this issue to the extent it relies on *State v. Green*, 311 Kan. ___ (No. 118,366, this day decided), slip op. at 37, that finds the presence of *any* evidence tending to support the defendant's affirmative defense theory will justify an instruction on that defense—no matter how slight the evidence or how improbable the theory. The affirmative defense statute directs trial judges to instruct on such defenses only when "competent evidence," or "that which could allow a *rational* fact finder to *reasonably conclude* that the defense applies" is present. (Emphases added.) K.S.A. 2019 Supp. 21-5108(c). As I explained in *State v. Haygood*, 308 Kan. 1387, 1410, 430 P.3d 11 (2018) (Rosen, J., concurring), the language in this statute requires that the court act as a gatekeeper when offering instructions by "mak[ing] some assessment of the strength of the evidence on which" an affirmative defense assertion stands. While I agree there was no evidence of impairment here, I disagree with any portion of the majority decision holding that the presence of any evidence, however slight, mandates the district court to instruct and skip this test.

STEGALL, J., joins the foregoing concurring opinion.

34